No. 26-1657

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FREEDOM FOUNDATION,

*Plaintiff-Appellant*,

v.

DAN RAYFIELD, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Oregon, No. 3:25-cv-2451-MTK

# BRIEF FOR APPELLANT

REBEKAH SCHULTHEISS
FREEDOM FOUNDATION
P.O. Box 552
Olympia, WA 98507

PAUL D. CLEMENT
*Counsel of Record*
ANDREW LAWRENCE
PHILIP HAMMERSLEY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant*

July 2, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUES .......... 4

CONSTITUTIONAL AND STATUTORY PROVISIONS .......... 4

STATEMENT OF THE CASE .......... 4

A. Factual Background .......... 4

1. The Freedom Foundation and Its Speech .......... 4

2. *Janus* and the Post-*Janus* Legal Landscape .......... 6

3. Oregon Enacts Chapter 307 .......... 11

4. Chapter 307 Chills and Distorts the Foundation's Speech .......... 14

B. Procedural Background .......... 17

SUMMARY OF ARGUMENT .......... 18

STANDARD OF REVIEW .......... 20

ARGUMENT .......... 21

I. The Freedom Foundation May Proceed With Its Claims Against The State Defendants Under *Ex Parte Young*. .......... 21

II. The Freedom Foundation May Proceed With Its Claims Against The Union Defendants. .......... 28

A. The Foundation Has Article III Standing to Sue the Union Defendants. .......... 28

B. The Union Defendants Are Engaged in State Action Under §1983. .......... 36

1. The Union Defendants Have Engaged in Action. 36

2. The Union Defendants Are Properly Characterized as State Actors. 38

III. The Freedom Foundation Is Entitled To Preliminary Relief. 48

A. The Freedom Foundation Is Likely To Succeed On The Merits. 49

1. Chapter 307 Unconstitutionally Discriminates Between Unprotected Speech Based on Content and Viewpoint. 49

2. Chapter 307 Unconstitutionally Infringes Protected Speech. 56

3. Chapter 307 Unconstitutionally Compels Speech. 59

4. Chapter 307 Is Unconstitutionally Vague. 60

B. The Remaining Factors Favor Granting Relief. 62

CONCLUSION 63

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*A.J.T. v. Osseo Area Schs., Ind. Sch. Dist. No. 279*,
605 U.S. 335 (2025)....................22

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982)....................42

*Am. Bev. Ass'n v. City & Cnty. of San Francisco*,
916 F.3d 749 (9th Cir. 2019)....................63

*Animal Legal Def. Fund v. Kelly*,
9 F.4th 1219 (10th Cir. 2021)....................50

*Animal Legal Def. Fund v. Vaught*,
8 F.4th 714 (8th Cir. 2021)....................35

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
320 F.3d 1002 (9th Cir. 2003).................... 31, 33

*Belgau v. Inslee*,
975 F.3d 940 (9th Cir. 2020).................... 38, 39, 40, 41

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009)....................49

*Bland v. Fessler*,
88 F.3d 729 (9th Cir. 1996)....................47

*Blumberger v. Tilley*,
115 F.4th 1113 (9th Cir. 2024)....................23

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023)....................35

*Brunozzi v. Cable Commc'ns, Inc.*,
851 F.3d 990 (9th Cir. 2017)....................56

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................42

*Cal. Pro-Life Council, Inc. v. Getman*,
328 F.3d 1088 (9th Cir. 2003) .................................................................... 29, 33

*Chiles v. Salazar*,
146 S.Ct. 1010 (2026) ..............................................................................49

*Citizens United v. FEC*,
558 U.S. 310 (2010) ..................................................................................59

*Coal. to Def. Affirmative Action v. Brown*,
674 F.3d 1128 (9th Cir. 2012) ....................................................................21

*Dennis v. Sparks*,
449 U.S. 24 (1980) ....................................................................................38

*Desire, LLC v. Manna Textiles, Inc.*,
986 F.3d 1253 (9th Cir. 2021) ....................................................................26

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ..................................................................................47

*Edge v. City of Everett*,
929 F.3d 657 (9th Cir. 2019) ......................................................................61

*Ellingburg v. United States*,
607 U.S. 163 (2026) ..................................................................................42

*Ex parte Young*,
209 U.S. 123 (1908) ............................................................................. *passim*

*First Resort, Inc. v. Herrera*,
860 F.3d 1263 (9th Cir. 2017) ....................................................................56

*Free Speech Coal. v. Reno*,
198 F.3d 1083 (9th Cir. 1999) ....................................................................61

*Frohnmayer v. State Accident Ins. Fund Corp.*,
660 P.2d 1061 (Or. 1983) ...........................................................................26

*Holley v. Cal. Dep't of Corr.*,
599 F.3d 1108 (9th Cir. 2010) ....................................................................20

*Huntington v. Attrill*,
146 U.S. 657 (1892) ........ 42, 44

*Imperial Sovereign Ct. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ........ 33

*Interpipe Contracting, Inc. v. Becerra*,
898 F.3d 879 (9th Cir. 2018) ........ 54

*Isaacson v. Mayes*,
84 F.4th 1089 (9th Cir. 2023) ........ 31, 34, 35

*Italian Colors Rest. v. Becerra*,
878 F.3d 1165 (9th Cir. 2018) ........ 31, 33, 35

*Janus v. AFSCME,Council 31*,
585 U.S. 878 (2018) ........ 1, 6, 62

*Kirtley v. Rainey*,
326 F.3d 1088 (9th Cir. 2003) ........ 41

*Kokesh v. SEC*,
581 U.S. 455 (2017) ........ 43

*L.A. Branch NAACP v. L.A. Unified Sch. Dist.*,
714 F.2d 946 (9th Cir. 1983) ........ 25

*L.A. Cnty. Bar Ass'n v. Eu*,
979 F.2d 697 (9th Cir. 1992) ........ 25

*Lane v. Salazar*,
911 F.3d 942 (9th Cir. 2018) ........ 60

*Lee v. Katz*,
276 F.3d 550 (9th Cir. 2002) ........ 41, 46, 47

*Long v. Van de Kamp*,
961 F.2d 151 (9th Cir. 1992) ........ 25

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) ........ 29, 37

*Lovell v. City of Griffin*,
303 U.S. 444 (1938)....................5

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024).................... *passim*

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022)....................21

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)....................46

*Morrison v. Olson*,
487 U.S. 654 (1988)....................3

*Naoko Ohno v. Yuko Yasuma*,
723 F.3d 984 (9th Cir. 2013)....................39

*Norbert v. City & Cnty. of San Francisco*,
10 F.4th 918 (9th Cir. 2021)....................21

*Nordling v. Johnston*,
283 P.2d 994 (Or. 1955)....................44

*NRA v. Vullo*,
602 U.S. 175 (2024)....................59

*Ochoa v. Pub. Consulting Grp., Inc.*,
48 F.4th 1102 (9th Cir. 2022).................... 36, 38

*Peace Ranch, LLC v. Bonta*,
93 F.4th 482 (9th Cir. 2024).................... 29, 30, 31, 34

*PhRMA v. Stolfi*,
153 F.4th 795 (9th Cir. 2025)....................59

*Planned Parenthood Great Nw. Haw., Alaska, Ind., Ky. v. Labrador*,
122 F.4th 825 (9th Cir. 2024)....................24

*Police Dep't v. Mosley*,
408 U.S. 92 (1972)....................5

*Potrero Hills Landfill, Inc. v. County of Solano*,
657 F.3d 876 (9th Cir. 2011) ........................................ 42

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) ........................................ 33, 37

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ........................................ 51, 52

*Rawson v. Recovery Innovations, Inc.*,
975 F.3d 742 (9th Cir. 2020) ........................................ 38, 40

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........................................ 49, 50

Reitman v. Mulkey,
387 U.S. 369 (1967) ........................................ 40, 41

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ........................................ 62

*Seattle Pac. Univ. v. Ferguson*,
104 F.4th 50 (9th Cir. 2024) ........................................ 28, 32, 33

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ........................................ 21

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ........................................ 48

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................ 29, 34

*Tex. Right to Life v. Van Stean*,
729 S.W.3d 896 (Tex. Ct. App. 2026) ........................................ 45, 46

*Thomas v. Collins*,
323 U.S. 516 (1945) ........................................ 57, 61

*Thornhill v. Alabama*,
310 U.S. 88 (1940) ........................................ 5

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022)........................................................ 29, 61

*United States v. Alvarez*,
617 F.3d 1198 (9th Cir. 2010)..............................................................51

*United States v. Corrales-Vazquez*,
931 F.3d 944 (9th Cir. 2019)................................................................28

*United States v. Griefen*,
200 F.3d 1256 (9th Cir. 2000)..............................................................54

*United States v. Peters*,
9 U.S. (5 Cranch) 115 (1809)...............................................................48

*United States v. Walther*,
652 F.2d 788 (9th Cir. 1981)................................................................41

*Valle del Sol Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013)........................................................ 50, 53

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013)..............................................................60

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988)................................................................... 30, 48

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019)................................................................59

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)............................................................... 26, 45, 48

*Wolfson v. Brammer*,
616 F.3d 1045 (9th Cir. 2010)..............................................................33

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024)...............................................................56

**Statutes**

28 U.S.C. §1291 ..........................................................................................4

28 U.S.C. §1292(a)(1)...................................................................................4

28 U.S.C. §1331 ..........3

42 U.S.C. §1983 .......... *passim*

2025 Or. Laws, ch. 307, §1(1)(b) .......... 12, 50

2025 Or. Laws, ch. 307, §1(1)(c) .......... *passim*

2025 Or. Laws, ch. 307, §1(1)(d) .......... 12, 58

2025 Or. Laws, ch. 307, §1(2) .......... 12, 49, 60

2025 Or. Laws, ch. 307, §1(4)(b) .......... 12, 23, 25

2025 Or. Laws. ch. 307, §1(4)(a) .......... 12, 22, 23, 43

O.R.S. §30.833 ..........54

O.R.S. §30.851(2)(b) ..........53

O.R.S. §30.863 ..........13

O.R.S. §133.875(1)(c) ..........53

O.R.S. §133.875(2)(c) ..........53

O.R.S. §165.815 ..........13

O.R.S. §180.060 .......... 22, 26

O.R.S. §180.060(1)(d) .......... *passim*

O.R.S. §180.210 ..........26

O.R.S. §180.220 ..........26

O.R.S. §243.650 ..........12

O.R.S. §243.650(13) .......... 12, 49, 50

O.R.S. §646.638(1) ..........53

O.R.S. §677.188 .......... 12, 58

O.R.S. §677.188(1) .......... 12, 30, 60

**Other Authorities**

AB 10835A, 2025-2026 Leg., Reg. Sess. (N.Y. 2026) .......................................... 48

Attachment Submitted by Ben Straka (Dec. 10, 2014) .......................................... 50

W. Blackstone, Commentaries on the Laws of England (1768) ............................ 43

Br. for the U.S. as Amicus Curiae Supporting Petitioners,
*Nike, Inc. v. Kasky*, No. 02-575 (U.S. Feb. 28, 2003) ....................................... 35

Letter from Johnny Earl, President, SEIU Local 503,
to the S. Comm. on Lab. & Bus. (May 6, 2025) ................................................ 44

Letter from Tracy Ann Nelson, Exec. Dir., OEA,
to Sen. Kathleen Taylor et al. .......................................................................... 44

Charles W. Rhodes & Howard M. Wasserman,
*Judicial Process and Vigilante Federalism*,
108 Corn. L. Rev. Online 125 (2023) ................................................................ 42

Antonin Scalia & Bryan A. Garner,
*Reading Law* (2012) ........................................................................................ 23

Verified Compl.,
*Project Veritas v. Schmidt*,
No. 3:20-cv-1435 (D. Or. Aug. 24, 2020) .......................................................... 37

## INTRODUCTION

This appeal concerns the latest joint effort by states and public-sector unions to resist and undermine the Supreme Court's decision in *Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018). *Janus* held that forcing workers to make payments to public-sector unions and thereby subsidize objectionable speech violates the First Amendment. Invalidating mandatory payments unleashed a robust debate over voluntary membership. That result fully comports with the Framers' design, as it is the marketplace of ideas, not government coercion, that should dictate the level of financial support for union speech. Plaintiff Freedom Foundation has vigorously participated in that debate. The Foundation's core mission is to educate public-sector employees about their rights under *Janus* and to empower them to opt out of union membership if they do not support the union and its speech. Those efforts have proven enormously successful. With the Foundation's assistance, hundreds of thousands of employees nationwide have opted out of union membership in recent years, including over 30,000 employees in Oregon alone—allowing those Oregon workers to keep (and their unions to lose) more than $100 million.

These efforts have not gone unnoticed by public-sector unions. Unfortunately, however, rather than meeting speech with more speech, some public-sector unions have gone back to the playbook of government coercion in an effort to skew the debate and silence the Freedom Foundation. This litigation relates to the latest such

gambit in Oregon. In June 2025, public-sector unions successfully convinced Oregon's legislature to enact a law drafted by the unions themselves—House Bill 3789 (HB 3789), later enrolled as Chapter 307—that empowers the unions to bring lawsuits against individuals or entities that allegedly "impersonate" union representatives.

Chapter 307, however, is no ordinary anti-deception law. Such laws are typically comprehensive and content-neutral, rather than targeted at one side of an ongoing debate. There is nothing content- or viewpoint-neutral about Chapter 307, which prohibits false impersonation only if it "negatively impacts" the unions, not if it positively impacts the unions. In other words, Chapter 307 nakedly discriminates between permitted and verboten speech on the basis of viewpoint. And Chapter 307's definition of false impersonation is so capacious that it threatens to chill Freedom Foundation communications that simply inform public-sector employees about their constitutional opt-out rights—indeed, that is precisely what the law's proponents sought to achieve, as the legislative record makes crystal clear. The chilling effect is dramatic. Chapter 307 authorizes public-sector unions to collect a $6,250 bounty for each piece of offending mail or email sent by the Foundation. The upshot is that the Foundation faces potential liability to the tune of nearly $1 billion for sending a single piece of "unlawful" mail to every public employee in Oregon.

Chapter 307 is a blatant affront to the First Amendment. By empowering one side of an ongoing debate to use the machinery of the state to impose massive fines on the other, rather than join issue in the marketplace of ideas, this unconstitutional "wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). Nonetheless, the district court dismissed the Freedom Foundation's effort to re-level the playing field at the threshold. According to the court below, the state defendants have Eleventh Amendment immunity, while the public-sector-union defendants cannot be sued because they have not actually enforced the law against the Foundation or threatened to do so *in haec verba*. Those conclusions are egregiously wrong and provide a roadmap for states to chill disfavored speech. That is neither speculation nor hyperbole. Soon after the misguided decision below, other states began advancing copycat legislation, evidently convinced that they could silence disfavored speakers while evading judicial review. That dangerous state of affairs is untenable. This Court should reverse and make clear that the Foundation is entitled to preliminary relief as this litigation proceeds.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331. That court denied the Freedom Foundation's motion for a preliminary injunction and granted the motions to dismiss on March 13, 2026. *See* ER-5-6. The Foundation

filed a timely notice of appeal on March 17, 2026. *See* ER-244-45. This Court has jurisdiction under 28 U.S.C. §§1291 and 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the State Defendants are entitled to Eleventh Amendment immunity.

2. Whether the Union Defendants are amenable to suit under §1983.

3. Whether the Freedom Foundation is entitled to a preliminary injunction.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Relevant provisions appear in the Addendum to this brief.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. The Freedom Foundation and Its Speech

Since the Nation's earliest days, Americans have used handbills, flyers, and pamphlets to disseminate ideas and rally support for social and political causes. Thomas Paine and other revolutionaries circulated Common Sense to galvanize support for independence. *See* ER-214. Abolitionists in the 1830s used the postal system to send anti-slavery pamphlets as part of the Nation's first direct-mail campaign. *See* ER-214-15. And suffragettes distributed leaflets and postcards urging the public to support "Votes for Women." *See* ER-215. The First Amendment "necessarily embraces pamphlets and leaflets" and the like, which are "historic

weapons in the defense of liberty." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938).

That tradition is especially rich in the labor context. For over a century, unions and their critics have used mailers and handbills to persuade workers and to shape the debate over wages, working conditions, and union representation. Pro-labor forces distributed pamphlets to educate workers about the benefits of unionization and to call for strikes. *See* ER-215. By contrast, labor skeptics circulated their own flyers arguing against unionization and criticizing union leadership. *See* ER-215. That back-and-forth of speech and counter-speech reflects the First Amendment's premise that civic disputes are best resolved through the marketplace of ideas rather than government favoritism. Thus, when states used legislative fiat to skew the longstanding debate over labor relations, courts (including the Supreme Court) have not hesitated to strike down those efforts under the First Amendment. *See, e.g.*, *Police Dep't v. Mosley*, 408 U.S. 92 (1972) (holding unconstitutional a law with a pro-labor exception to picketing regulations); *Thornhill v. Alabama*, 310 U.S. 88 (1940) (holding unconstitutional a law banning labor picketing).

The Freedom Foundation has actively participated in this rich historical debate by using mailers and the digital medium to advance its mission. Established in 1991 in Washington state, the Foundation exists to promote free markets and limited, accountable government. *See* ER-121, 215. It does so in part by educating

public-sector employees about their rights and by encouraging them to opt out of public-sector unions. *See* ER-121, 215. The essential tools that the Foundation uses to accomplish that goal are direct-to-union-member mailers, billboards, and speech on online platforms. *See* ER-121, 215.

### 2. *Janus* and the Post-*Janus* Legal Landscape

The legal principles governing public-sector unions changed dramatically in 2018 when the Supreme Court issued its *Janus* decision. *Janus* involved a First Amendment challenge to a state law requiring public-sector employees to pay certain union dues even if they opted out of union membership and even if they objected to the positions that the union advocated. *See* 585 U.S. at 884-86. In the course of holding that law unconstitutional, the Court reaffirmed that forcing "individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command," and so do laws "[c]ompelling a person to subsidize the speech of other private speakers." *Id.* at 892-93. The Court thus struck down the state law and admonished that "States and public-sector unions may no longer extract [union dues] from nonconsenting employees." *Id.* at 929. Instead, unions may collect such dues only when "the employee" waives her First Amendment rights by "affirmatively consent[ing] to pay." *Id.* at 930.

After *Janus*, the Freedom Foundation doubled down on its efforts to educate public-sector employees about their constitutional prerogative not to subsidize

public-sector unions and to assist employees who sought to exercise their opt-out rights. Among other things, the Foundation launched an initiative called "Opt Out Today" to inform public-sector employees about when and how they could leave their unions and the amount of money that they could save by opting out. *See* ER-123, 216. The Foundation also continued to send materials directly to public-sector employees, such as this "St. Paddy's Day" mailer:

**Front**



Back




ER-122, 128, 216-17. The mailer informs members of SEIU Local 503 in Oregon that they can save hundreds of dollars by opting out, and it includes a pre-addressed reply mailer that the union member can sign and send to the Foundation (which will then transmit her opt-out form to the union) to resign her union membership. *See* ER-122, 128, 217. The mailer identifies that it is from "Freedom Foundation," and the opt-out form specifies that the signee authorizes "the Freedom Foundation" to transmit it on the signee's behalf. *See* ER-122, 128, 217.

The Freedom Foundation has also regularly distributed other mailers educating members about how much they paid annually in union dues. *See* ER-122, 217. The "Check" mailer pictured below uses a mockup of a check to illustrate the potential savings to union members if they exercise their opt-out rights:


Front

**Potential Limited Timeframe**

**Notice Date:** 02/24/2025
**Contact phone:** (833) 228-4969
**Respond by:** 04/15/2025

**Immediate response to this Notice Requested**

**URGENT NOTICE**

**Attention:**

Pursuant to the landmark decision rendered by the United States Supreme Court in *Janus v. AFSCME* (2018), this correspondence serves to inform you that the check below symbolizes the average sum an eligible government employee may add to their annual salary. In order to seize this financially beneficial opportunity, we kindly request you to complete the enclosed form and return it via the pre-addressed, postage-paid envelope provided herein.

This opportunity may be time sensitive for some union members due to potential "window period" language included on your union's membership card, collective bargaining agreement, or in state law.

**To expedite this process, we offer multiple avenues for assistance. You may engage with a customer service representative by either:**

1. Sending an email to info@OptOutToday.com
2. Visiting our website at OptOutToday.com
3. Contacting us at (833) 228-4969

Should you require further clarification or immediate action, we strongly recommend employing one of the aforementioned channels of communication.

Employer:
TRC ID:

**Requested response by:** 04/15/2025

Representation of One Year of Union Dues

To the Order of

$900.00

Signature required for redemption

Back

*See* ER-122, 136, 217. Like the St. Paddy's Day mailer, the Check mailer informs union members that they have a constitutional right under *Janus* to opt out of union dues and gives them an opt-out form to sign and return to the Foundation. The envelope (not pictured) identifies the "Freedom Foundation" as the source of the communication. *See* ER-136, 218.

The Freedom Foundation also maintains the Opt Out Today website to provide further information to union members and additional opt-out assistance. Some mailers have included QR codes that direct union members to tailored pages on this website, where they can complete an opt-out form specific to their union. *See* ER-130, 132, 218. The website below—specific to members of Defendant Oregon School Employees Association (OSEA)—is illustrative:




*See* ER-140-45, 218-19.

The Freedom Foundation's outreach to public-sector employees has proven remarkably effective. Since 2018, the Foundation has helped over 250,000 public-

sector employees nationwide to opt out of their unions. *See* ER-123, 219. Those opt-outs have saved public-sector employees over $700 million in dues. *See* ER-123, 219. In Oregon, where both public-sector unions and objecting members are prevalent, the Foundation has helped over 30,000 public-sector employees leave their unions, saving them more than $100 million in dues. *See* ER-123, 219.

#### 3. Oregon Enacts Chapter 307

Of course, every dollar that a public-sector employee *saves* on dues is one less dollar in the public-sector union's coffers. Unions thus have formidable financial incentives to deter opt outs. To the extent that they do so via robust debate, that is all to the good. But the temptation for public-sector unions to resort to variants of the government coercion that sustained them for decades before *Janus* is powerful. Here, hemorrhaging members and dues revenue, and unable to persuade significant numbers of public-sector employees of the value of maintaining union membership, public-sector unions—including Defendants AFSCME Council 75, SEIU Local 503, OSEA, and OEA—yielded to that temptation and turned to the Oregon legislature for help. *See* ER-219-20.

The result was House Bill 3789—later enrolled as Chapter 307—which the Oregon legislature passed and the Governor signed in June 2025. As of January 1, 2026, Chapter 307 makes it illegal "for any person to falsely impersonate a union

representative." 2025 Or. Laws, ch. 307, §1(2). An entity commits that offense if it uses:

> fraud or misrepresentation to make a verbal or written communication that purports to be authorized or otherwise approved by a labor organization but that has not, in fact, been authorized or approved by the labor organization, with the intent to undermine or interfere with the operations of the labor organization, or otherwise negatively impact the labor organization.

§1(1)(c). Chapter 307 defines "[f]raud or misrepresentation" to mean "the intentional misrepresentation or misstatement of a material fact, concealment of or failure to make known any material fact, or any other means by which misinformation or a false impression knowingly is given." O.R.S. §677.188(1); *see* §1(1)(d) (incorporating O.R.S. §677.188). The law in turn defines a "labor organization" as "any organization that has as one of its purposes representing employees in their employment relations with public employers." O.R.S. §243.650(13); *see* §1(1)(b) (incorporating O.R.S. §243.650). Chapter 307 creates a private cause of action for union representatives "alleging a violation" of the law. §1(4)(a). Unions "may" seek damages "in an amount of $6,250 per incident in any action in which the plaintiff establishes that the defendant falsely impersonated a union representative." §1(4)(b). The statute does not, however, eliminate preexisting enforcement capabilities enjoyed by state officials.

Though styled as an anti-deception statute, Chapter 307 chills speech and skews debate in ways that neutral anti-deception laws—already on the books long

before Chapter 307's enactment—do not permit. *See, e.g.*, O.R.S. §165.815. For example, Oregon's criminal impersonation prohibition requires a jury to find proof of injury, intent to deceive a third party, and that a reasonable person would believe that she is speaking with the impersonated individual. *See id.*; *see also id.* §30.863 (granting a civil action to individuals harmed by criminal impersonation). More important, such statutes apply equally to participants on both sides of ongoing debates on all manner of contentious issues from access to abortion clinics to labor unions to statewide referenda. Chapter 307, by contrast, requires far less proof, features fewer procedural protections, and applies to only one side of the debate. It is written in a way that plainly skews the debate and empowers public-sector unions to target entities like the Freedom Foundation and threaten them with massive penalties just for informing public-sector employees about their constitutional rights.

That is no accident. During committee hearings, legislators candidly identified the "legal team behind the bill" as a law firm that represents labor unions. ER-221. Legislative proponents urged passage of Chapter 307 as a response to communications distributed by "anti-union" and "union busting" organizations. ER-221. In fact, the hearings focused exclusively on the Freedom Foundation's mailers. Lawmakers remarked that "the Freedom Foundation was singled out by name multiple times" during committee hearings, and the only evidence of so-called impersonating communications that proponents could muster came in the form of

Foundation mailers. ER-222. Indeed, legislative proponents identified the "Check" mailer reproduced above as an example of the purportedly "deceptive fliers" that Oregon needed to outlaw. ER-222. They also highlighted the Opt Out Today website excerpted above as another justification for enacting Chapter 307. *See* ER-222. And after one union official recounted mailers from the Foundation, he had a simple request for the legislature: "tell them to stop." ER-222.

### 4. Chapter 307 Chills and Distorts the Foundation's Speech

After reviewing Chapter 307, and in light of the considerable evidence that Oregon enacted the law in response to the Freedom Foundation's specific activities, the Foundation took several steps to trim its First Amendment sails in an effort to avoid exposure to liability. First, the Foundation added a prominent disclaimer that readers must review and acknowledge before accessing the portion of the Opt Out Today website that provides information about public-sector unions in Oregon:



ER-123-24, 222-23. Second, the Foundation reluctantly decided not to distribute its regularly scheduled mailers, such as the New Year's postcard pictured below:




ER-124, 147-48, 223-24. The Foundation would have sent this postcard and numerous other mailers to public-sector employees that belong to the Union Defendants in Oregon but for Chapter 307. *See* ER-124, 224. The Foundation stayed its hand, however, based on its fear that those mailers would violate Chapter 307 and subject the Foundation to liability. *See* ER-124, 224.

That fear is particularly credible based on union correspondence that the Freedom Foundation received in 2025 in response to a FOIA request. Following Chapter 307's enactment, the Foundation requested information about public-sector employees working for Benton County, Oregon. *See* ER-125-26, 154-208, 224.

Union officials from Oregon's Local AFSCME Chapter learned about the Foundation's request, warned its members that the Foundation "is an organization founded specifically to eradicate public sector unions," and stated that the Foundation will "attempt to get your home address … so they can send post cards." ER-163, 224. The AFSCME official asked members to pass along any mailers from the Foundation because "[o]ur attorneys would love to review" them. ER-163, 224. The union official noted that "*[w]e* recently passed HB 3789 which prevents anyone from impersonating a Union representative," and he stated that some mailers from the Foundation "could violate this new law." ER-163, 224 (emphasis added).

The Freedom Foundation strongly desires to resume engaging in its constitutionally protected speech and would not have changed its practices but for Chapter 307 and the threat of enforcement actions. *See* ER-124-25, 224-26. Specifically, the Foundation would like to remove the disclaimer on its website. *See* ER-123-24, 223. The Foundation would also like to resume its mailing campaign—which, in 2025, involved approximately 35 sets of mailers sent to employees who are members of the Union Defendants. *See* ER-124-26, 224-26. But the Foundation has abstained and will abstain from this activity as long as Chapter 307 remains in effect. *See* ER-124-26, 224-26.

### B. Procedural Background

Before Chapter 307 took effect on January 1, 2026, the Freedom Foundation filed suit invoking 42 U.S.C. §1983 and *Ex parte Young* and seeking a declaration that the law violates the First Amendment and the Due Process Clause, along with an injunction that restrains the defendants from enforcing the law's provisions. *See* ER-5-6. The Foundation named as defendants the Oregon Attorney General and members of the Oregon Employment Relations Board (ERB) (together, the "State Defendants"), as well as various unions that lobbied for the legislation—Oregon AFSCME Council 75; Oregon AFSCME Council 75, AFL-CIO Local 2064; Service Employees International Union, Local 503, Oregon Public Employees Union; OEA; and OSEA (together, the "Union Defendants"). *See* ER-210. The Foundation also moved for a preliminary injunction. *See* ER-5-6. Both the State Defendants and the Union Defendants opposed the motion and separately filed motions to dismiss. *See* ER-5-6. Although the State Defendants presented no defense of Chapter 307 on the merits, they argued that they are entitled to sovereign immunity. *See* D.Ct.Dkt.26, 27. The Union Defendants argued that they are not state actors for purposes of §1983 before vigorously defending Chapter 307 on the merits. *See* D.Ct.Dkt.24, 28.

The district court granted the motions to dismiss and denied the motion for preliminary relief as moot without addressing the merits. *See* ER-6. The court first dismissed the State Defendants from the case, reasoning that, because Chapter 307

included a private cause of action, the State Defendants had no connection with enforcing the statute and thus that the *Ex parte Young* exception to sovereign immunity does not apply. *See* ER-10-13. The court next dismissed the Foundation's claims against the Union Defendants as both non-justiciable under Article III (*i.e.*, "not ripe") and for failure to state a claim under §1983, emphasizing "there are no allegations that any Union Defendant has filed or threatened to file a lawsuit under Chapter 307." ER-13-15.

## SUMMARY OF ARGUMENT

Under the decision below, states are free to enact legislation declaring disfavored speech unlawful, yet would-be speakers have no judicial recourse so long as the states are clever enough to authorize suits by private parties who are clever enough to enjoy the legislation's chilling effect on their adversaries, while stopping just short of expressly threatening litigation. That is a recipe for gutting the First Amendment. This Court should reverse and confirm that the Freedom Foundation is entitled to a preliminary injunction.

**I.** The State Defendants cannot rely on an Eleventh Amendment defense because the *Ex parte Young* exception to sovereign immunity authorizes suits against state officials so long as they have "some connection" to enforcement of the challenged law. Oregon law supplies that connection by authorizing the Attorney General to commence and prosecute "any action" necessary in "any court" to protect

the State's interests when requested by "any" state officers or boards, including the ERB. Although the district court acknowledged that provision of Oregon law, it dismissed the provision as irrelevant because Chapter 307 includes a private cause of action and because it worried that abiding by the provision's plain text would expose the State Defendants to a variety of *Ex parte Young* suits. But Chapter 307's private cause of action does not make unions the exclusive enforcement authorities, and the state's susceptibility to *Ex parte Young* actions to keep unconstitutional laws in check is a feature—not a bug.

**II.** Nor is there any obstacle to the Freedom Foundation's claims against the Union Defendants. The Foundation plainly has Article III standing to press those claims: It intends to continue engaging in constitutionally protected speech (*e.g.*, by sending mailers to public-sector employees); that speech is at least arguably covered—and demonstrably chilled—by Chapter 307; and the Foundation faces a credible threat of enforcement from the Union Defendants, who have never disavowed enforcement of the statute. That credible threat of enforcement also qualifies as the type of "state action" necessary to trigger §1983. The district court's conclusion that a First Amendment plaintiff must wait until an enforcement action is filed or expressly threatened conflicts with settled precedent and severely chills protected speech. Absent reversal, other states will seize on the court's misguided

ruling to advance copycat legislation aimed at disfavored speech, and some have already started to do so. That untoward trend should be stopped in its tracks.

**III.** On the merits, the Freedom Foundation is clearly entitled to a preliminary injunction. Chapter 307 is unconstitutional several times over, and so the Foundation's success on the merits is exceedingly likely. Chapter 307 draws unjustified content- and viewpoint-based distinctions; it targets core political advocacy; it coerces speakers to alter their messages with source-identifying disclaimers; and it is impermissibly vague. More fundamentally, it impermissibly picks sides in a debate in which the First Amendment itself requires the government to stay neutral. The remaining equitable factors strongly support more speech, not less speech, as this litigation proceeds. The Foundation's loss of constitutional freedoms is irreparable, and Oregon has no legitimate interest in enforcing a law that violates the Constitution, especially when neutral laws against deception remain on the books. In short, the Court should reinstate the complaint, hold that the Foundation is entitled to a preliminary injunction, and allow the Foundation to resume its constitutionally protected speech without fear of ruinous liability.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for Eleventh Amendment immunity, *see Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1111 (9th Cir. 2010), for lack of standing, *see Mecinas v. Hobbs*, 30 F.4th 890, 895-96 (9th Cir.

2022), and for failure to state a claim, *see Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011). This Court reviews the denial of preliminary injunctive relief for abuse of discretion, reviewing legal conclusions *de novo* and factual findings for clear error. *See Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 927, 935-36 (9th Cir. 2021).

## ARGUMENT

### I. The Freedom Foundation May Proceed With Its Claims Against The State Defendants Under *Ex Parte Young*.

1. The district court started off on the wrong foot in holding that the State Defendants are shielded by Eleventh Amendment immunity. It is well-established that the Eleventh Amendment poses no obstacle to "actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law." *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012). Under *Ex parte Young*, so long as the defendant has "some connection with the enforcement of the act," the official cannot assert sovereign immunity as a defense. *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). As the "some connection" language itself indicates, *Ex parte Young* establishes a "modest requirement" that "demands merely that the implicated state official have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Matsumoto v. Labrador*, 122 F.4th 787, 803 (9th Cir. 2024).

That requirement is satisfied even when the state official does not have the "exclusive" or even the "primary" responsibility to enforce the challenged law. *Id.* "[S]ome connection" is all that is required.

The State Defendants are plainly subject to suit under that standard. Oregon law vests the Attorney General with the specific authority to "[a]ppear, commence, prosecute or defend *any* action, suit, matter, cause or proceeding in *any* court when requested by *any* state officer, board or commission when, in the discretion of the Attorney General, the same may be necessary or advisable to protect the interests of the state." O.R.S. §180.060(1)(d) (emphases added); *see* ER-213 (citing O.R.S. §180.060). That provides a sufficient connection for *Ex parte Young* purposes because it grants the Attorney General the authority to "commence" or "prosecute" "any action" in "any court." §1(4)(a). Section 180.060's use of "any" underscores the statute's "expansive and unqualified" reach to *all* legal proceedings initiated in state or federal court. *A.J.T. v. Osseo Area Schs., Ind. Sch. Dist. No. 279*, 605 U.S. 335, 345 (2025). That expansive category extends to enforcement proceedings brought under Chapter 307.[1]

[1] As the statutory text also reveals, the Attorney General's enforcement authority requires an initial request for enforcement by "any" state "officer" or "board." O.R.S. §180.060(1)(d). The ERB and its officials (also named as Defendants here) thus have "some connection with enforcement" too.

The text of Chapter 307 reinforces that the Attorney General's authority under §180.060(1)(d) remains intact here. Section 1(4)(a) of Chapter 307 authorizes "[a] union representative" to bring an enforcement action under the statute. §1(4)(a). Section 1(4)(b) then explains what "*a plaintiff*" may receive "in any action in which the plaintiff establishes that the defendant falsely impersonated a union representative." §1(4)(b) (emphasis added). This Court presumes that the "variation in language was intentional and that [the Oregon legislature] did not intend to treat [union representative] synonymously with [plaintiff]." *Blumberger v. Tilley*, 115 F.4th 1113, 1131 (9th Cir. 2024); *see* Antonin Scalia & Bryan A. Garner, *Reading Law* 170-73 (2012). The most sensible inference from that material variation in language is that the Oregon legislature did not intend to make a union representative the *only* "plaintiff" who may enforce Chapter 307 and instead contemplated that a broader set of plaintiffs—including public officials exercising separate authority to enforce Oregon law—could bring enforcement actions of their own.

The Attorney General cannot evade judicial review simply because his enforcement authority under §180.060(1)(d) does not kick in until after another state agency or official—like the ERB or one of its officers, *see supra*, p.22 n.1—"request[s]" him to act. The Eleventh Amendment does not bar suits against an attorney general even when his enforcement power arose only after other officials formally requested his assistance, as this Court's precedent confirms. In *Planned*

*Parenthood Great Nw. Haw., Alaska, Ind., Ky. v. Labrador*, the plaintiffs sued the Idaho Attorney General and Idaho's county prosecutors because they believed that state law infringed their First Amendment speech rights. *See* 122 F.4th 825, 833-34 (9th Cir. 2024). The Attorney General claimed Eleventh Amendment immunity because he purportedly lacked a sufficient connection to the challenged statute for the case to proceed against him under *Ex parte Young*. *See id.* at 834, 841-43. State law vested county prosecutors with the "primary duty" to enforce the challenged law, and the Attorney General could exercise his enforcement powers *only* upon request from the county prosecutor or the Governor. *See id.* at 842 (collecting statutory citations). And neither the county prosecutor nor the Governor had requested the Attorney General's "assistance to enforce the challenged statute." *Id.* at 843. Nonetheless, this Court held that the Attorney General had a sufficient connection to the statute under *Ex parte Young* because, if requested, he did have the authority to enforce its provisions. *See id.* at 842-43. The same is true for the Oregon Attorney General's enforcement power under §180.060(1)(d) here.

2. The district court's contrary conclusion is deeply flawed. The court first suggested that a sufficient connection for *Ex parte Young* purposes exists only if that particular statute "empower[s] the individual to enforce it." ER-11. That proposition is irreconcilable with *Ex parte Young* itself, which explains that "[i]t has not … been held that it was necessary that such duty" to enforce the law "should be

declared in the same act which is to be enforced." *Ex parte Young*, 209 U.S. at 157. Rather, "[t]he fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id.* Here, as explained above, the State Defendants have the requisite connection with enforcement of Chapter 307 by virtue of §180.060(1)(d). While the court below thought otherwise because Chapter 307 states that "[a] union representative … may bring a civil action," ER-11 (quoting §1(4)(b)), that permissive language just means that union representatives *also* have some connection with enforcement, not that they have a monopoly on enforcement.

Confronted with §180.060(1)(d), the district court invoked this Court's statements that "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision" does not satisfy *Ex parte Young* and portrayed §180.060(1)(d) as just such a "generalized duty statute." ER-12. It is not, as §180.060(1)(d) goes far beyond saying that the Attorney General has a "duty to see that the laws of the state are faithfully executed," *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 714 F.2d 946, 953 (9th Cir. 1983), or that he has a "power to direct and advise" that is "not binding," *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992) (per curiam); *see L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). Indeed, comparable provisions do exist under Oregon

law. *See, e.g.*, O.R.S. §§180.210, .220. But §180.060(1)(d) is not one of them. To the contrary, that statute affirmatively provides "a specific grant of authority" to bring an action to enforce state law at the request of another state official, *Matsumoto*, 122 F.4th at 802, and declares that the Attorney General "shall" prosecute and maintain actions that he deems necessary to protect the state's interests. *Ex parte Young* requires nothing more.[2]

The district court nonetheless refused to give §180.060(1)(d) its plain meaning because it believed that it would give him enforcement authority with respect to a variety of state statutes and thus would "make the Attorney General a universal defendant." ER-12. That policy concern provides no basis for rewriting the statute, *see Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1272 (9th Cir. 2021), and is misplaced in all events. To the extent that Oregon wants to foreclose the possibility of its Attorney General being an available *Ex parte Young* defendant for a particular statute, it is free to "expressly prohibit" the Attorney General from bringing enforcement proceedings under that statute. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 47 n.4 (2021). But Chapter 307 contains no such prohibition, and the state

---

[2] The district court cited an Oregon Supreme Court decision that passingly observed that O.R.S. §180.060 "describes in a general way the duties of the Attorney General." ER-12 (quoting *Frohnmayer v. State Accident Ins. Fund Corp.*, 660 P.2d 1061, 1065 (Or. 1983)). That decision never mentioned *Ex parte Young* and, *a fortiori*, did not suggest that §180.060(1)(d) fails to satisfy *Ex parte Young*'s modest "some connection with enforcement" standard.

is not entitled to have it both ways, preserving the possibility of Attorney-General enforcement (at the request of a state entity) and evading the possibility of an *Ex parte Young* suit. Moreover, precluding the citizenry from avoiding the prospective enforcement of an unconstitutional statute is hardly something to be encouraged. Thus, to the extent that the Attorney General can be held to account for the constitutionality of the full range of statutes that he can enforce, that is a feature, not a bug.

The district court's other reasoning is equally unpersuasive. The court faulted the Freedom Foundation for identifying "no authority for the proposition that ORS 180.060(1)(d) creates a cause of action against state officials not otherwise provided by explicit statutory directive." ER-12. But that looks for the wrong thing in the wrong place. The Foundation never argued that §180.060(1)(d) provides a cause of action *against* state officials. *Ex parte Young* provides the cause of action. Section 180.060(1)(d) simply provides the Attorney General with enough enforcement authority to make him a proper defendant under *Ex parte Young*.

Finally, the district court protested that the Freedom Foundation's position would mean that "all prior decisions applying Eleventh Amendment immunity to the Attorney General in similar cases were wrongly decided." ER-12. That concern is both misguided and wildly overstated. Courts need only decide the issues and arguments presented to them by the parties. *See United States v. Corrales-Vazquez*,

931 F.3d 944, 954 (9th Cir. 2019). The question whether the Attorney General has the requisite authority to be a proper defendant in an action challenging the constitutionality of Chapter 307 is a question of first impression. As to the other cases cited by the district court—a grand total of two unpublished district court decisions—that disallowed challenges to other statutes, they are beside the point, especially given that they did not specifically address §180.060(1)(d).

## II. The Freedom Foundation May Proceed With Its Claims Against The Union Defendants.

The district court's holding that the Freedom Foundation cannot proceed with its claims against the Union Defendants fares no better. In reality, this Court has two routes to reach the merits, and there is no basis to shield Oregon's blatantly unconstitutional law from judicial review.

### A. The Foundation Has Article III Standing to Sue the Union Defendants.

1. The district court posited that the Freedom Foundation's claims against the Union Defendants are "not ripe." ER-15. That amounts to saying that the Foundation lacks Article III standing to press its claims, as "[t]he analysis for constitutional ripeness and pre-enforcement injury" for Article III standing purposes "is the same." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 65 n.4 (9th Cir. 2024); *see Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093-94 & n.2 (9th Cir.

2003). The notion that the direct target of an unconstitutional law that is already chilling its speech lacks Article III standing is as wrong as it is dangerous.

The Freedom Foundation has standing to bring its pre-enforcement challenge against the Union Defendants because it established an "injury in fact, causation, and a likelihood that a favorable decision will redress [its] alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). "For pre-enforcement plaintiffs" like the Foundation, "the injury is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). In other words, as the Supreme Court explained in *Susan B. Anthony List v. Driehaus*, in the "pre-enforcement" context, "a plaintiff satisfies the injury-in-fact requirement where he alleges [1] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [2] there exists a credible threat of prosecution thereunder.'" 573 U.S. 149, 159 (2014); *see Matsumoto*, 122 F.4th at 797. The Foundation's allegations easily satisfy that two-part test—especially because, in the First Amendment context, the "unique standing considerations" applicable to pre-enforcement challenges "tilt dramatically toward a finding of standing." *Tingley v. Ferguson*, 47 F.4th 1055, 1066-67 (9th Cir. 2022).

First, the Freedom Foundation's "intended speech" is constitutionally protected and "arguably falls within the statute's reach." *Getman*, 328 F.3d at 1095. Substantial record evidence shows that Chapter 307 is "aimed directly at" the

Foundation's protected speech. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Legislative sponsors and proponents repeatedly referred to the Foundation—and *only* the Foundation—by name, and they decried the organization's mailers and communications as misleading and fraudulent. *See supra*, p.13-14. Oregon lawmakers specifically identified the Foundation's "Check" mailer "as an example of the 'deceptive fliers'" that Chapter 307 prohibits. ER-222. And but for Chapter 307, the Foundation would have sent mailers that are "substantially similar" to that apparently verboten flier. ER-125, 225. On this record, there is no denying that the Foundation's intended speech arguably falls within Chapter 307's reach. *See, e.g.*, *Peace Ranch*, 93 F.4th at 490 (standing exists when law enacted with the plaintiff's conduct "in mind").

Chapter 307's capacious definition of "fraud or misrepresentation" underscores the point. The statute sweeps beyond intentional misrepresentations of material fact to reach the "concealment of or failure to make known any material fact, or *any other means by which misinformation or a false impression knowingly is given*." O.R.S. §677.188(1) (emphasis added). And the statute pairs that broad prohibition with a *mens rea* requirement that is satisfied whenever someone intends "to undermine or interfere with the operations of the labor organization, or *otherwise negatively impact the labor organization*." §1(1)(c) (emphasis added). Taken together, those open-ended statutory provisions create a serious vagueness problem:

Regulated speakers are left to guess what qualifies as "false impression" and when ordinary advocacy crosses the line into an intent to "otherwise negatively impact" a labor organization. *See infra*, pp.60-62. Those "vagueness allegations must be taken as true for the purpose of determining standing and, if those allegations are true, then [the Foundation's] conduct may violate the statute." *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023).

Second, the Freedom Foundation faces a credible threat that the Union Defendants will enforce Chapter 307 against the organization. "In challenging a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to disavow enforcement' is sufficient to establish a credible threat of prosecution in pre-enforcement challenges on First Amendment grounds." *Matsumoto*, 122 F.4th at 797 (emphasis omitted). This case involves a challenge to a new law, and the Union Defendants have conspicuously never disavowed an intent to enforce Chapter 307. That failure to disavow "is all that is needed to show imminent injury to a constitutional interest in a pre-enforcement challenge." *Id.* at 798; *see, e.g.*, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173-74 (9th Cir. 2018); *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006-07 (9th Cir. 2003); *see also Peace Ranch*, 93 F.4th at 490 (this prong "often rises or falls with the enforcing authority's willingness to disavow enforcement"). And that failure to disavow makes perfect sense: The Union

Defendants went to all the trouble to procure this extraordinary legislation with the Foundation and its mailers front of mind. The notion that, having gone to all that trouble, they would disavow the possibility of using the legislation as intended strains credulity.

But the failure to disavow enforcement does not stand alone. The Freedom Foundation provided evidence that at least one Defendant is actively collecting Foundation mailers so that its "attorneys" could evaluate the possibility of Chapter 307 actions. ER-163, 224. In an email to union members, a representative of Defendant Oregon AFSCME Council 75 asked recipients to forward any mailers that they received from the Foundation because "[s]ome of [those] mailings are so similar to union material that it could violate this new law" that "we recently passed." ER-163, 224. That solicitation is yet another "clear sign" that the Foundation faces "a substantial threat" of enforcement. *Seattle Pac.*, 104 F.4th at 60 (finding a credible threat where the defendant never disavowed his intent to investigate and had instead "affirmatively solicited more complaints of 'possible employment discrimination'").

That the Union Defendants "vigorously defen[d] the constitutionality of the statute and its broad coverage" eliminates any conceivable doubt. *Matsumoto*, 122 F.4th at 798. Having procured this law, the Union Defendants are hardly indifferent to whether the law is unconstitutional. The Union Defendants' vigorous defense of Chapter 307 on the merits thus corroborates the credible threat that the Foundation

faces. *See, e.g.*, *Imperial Sovereign Ct. v. Knudsen*, 170 F.4th 820, 840 (9th Cir. 2026); *Matsumoto*, 122 F.4th at 798.

The other two elements of standing—causation and redressability—readily follow from those principles. Because the Freedom Foundation faces an injury from the credible threat that the Union Defendants will bring an enforcement action, that injury is traceable to the Union Defendants, and granting the requested relief would redress it. *See, e.g.*, *Seattle Pac.*, 104 F.4th at 61.

2. The district court held that the Freedom Foundation lacks a justiciable claim against the Union Defendants because they had not "yet … sue[d] or threaten[ed] to sue." ER-14-15. That conclusion is misguided.

Time and again, this Court has held that a plaintiff bringing a pre-enforcement First Amendment claim (like the Freedom Foundation) need *not* postpone litigation until after the defendant actually sues or threatens suit. *See, e.g.*, *Project Veritas v. Schmidt*, 125 F.4th 929, 941-42 (9th Cir. 2025) (en banc); *Italian Colors Rest.*, 878 F.3d at 1173; *Wolfson v. Brammer*, 616 F.3d 1045, 1059-60 (9th Cir. 2010). The law does not require entities to "speak first and take their chances with the consequences," *Getman*, 328 F.3d at 1094; speakers may "hold [their] tongue and challenge now" even when the enforcing authority has not sued nor threatened suit, *Bayless*, 320 F.3d at 1006. The court below thus violated this Court's settled precedent by treating the absence of a lawsuit or a specific threat as dispositive of

justiciability.

Contrary to the district court's suggestion, *see* ER-14-15, the calculus does not change just because the Union Defendants are private parties rather than public officials. The *Driehaus* framework turns on whether the plaintiff faces a substantial threat of enforcement from the challenged law—not on whether the threatened enforcement comes from a government official or from private parties authorized to sue. *See Peace Ranch*, 93 F.4th at 489-90. In *Driehaus* itself, the Supreme Court found the threat "bolstered" because the law did not "limit[]" the "authority to file a complaint" to "a prosecutor or an agency," but instead extended that authority to "any person" with knowledge of the alleged violation. 573 U.S. at 164. And this Court has read *Driehaus* to require a collective assessment of "the threat posed by *all* the potentially enforcing authorities, together," which necessarily includes the "entire 'universe of potential complainants.'" *Matsumoto*, 122 F.4th at 798. Accordingly, the fact that the Union Defendants are private actors by no means diminishes the credible threat of enforcement the Foundation currently faces.

Indeed, this Court has already found a credible threat of enforcement based on the existence of a statutory private right of action rather than any filed or threatened private suit. *Contra* ER-14-15. In *Isaacson v. Mayes*, various plaintiffs filed suit challenging as unconstitutionally vague an Arizona law that criminalized the performance of certain abortions. *See* 84 F.4th at 1094-95. In addition to

enforcement from public officials, the statute created a private enforcement mechanism that allowed "the father of [a] fetus or embryo" to bring an action against a physician that performed an unlawful abortion. *Id.* at 1094. This Court squarely held that this state-law "private right of action—which creates a potential plaintiff each time physicians perform an abortion on a married woman—is enough to create a credible threat of future private enforcement." *Id.* at 1101; *see Italian Colors Rest.*, 878 F.3d at 1173-74 (finding a credible threat of enforcement in part because the challenged law "gives private citizens a right of action to sue").

*Isaacson* aligns with how other circuits approach pre-enforcement suits brought against statutes with private enforcement mechanisms. *See, e.g.*, *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 717, 720-21 (8th Cir. 2021) (holding that the plaintiffs established a credible threat because the private parties "declined to disavow an intent to pursue their rights under the law"); *see also Brown v. Kemp*, 86 F.4th 745, 756, 768, 775 (7th Cir. 2023); *cf.* Br. for the U.S. as Amicus Curiae Supporting Petitioners at 19-26, *Nike, Inc. v. Kasky*, No. 02-575 (U.S. Feb. 28, 2003), 2003 WL 899100.

By requiring the Freedom Foundation to wait until a private lawsuit is filed or explicitly threatened, the district court imposed a justiciability rule that *Driehaus*, *Isaacson*, and other out-of-circuit authorities all reject. Decades of standing jurisprudence do not vanish simply because the entity that enforces the law is private

rather than public. It would turn the First Amendment upside down to force regulated entities like the Foundation to violate a law burdening their speech, and then await a private enforcement suit, before seeking judicial review.

### B. The Union Defendants Are Engaged in State Action Under §1983.

In addition to erroneously holding that the Freedom Foundation has no Article III standing to press its claims against the Union Defendants, the district court also held that those defendants are not proper parties under §1983. That holding is likewise erroneous.

#### 1. The Union Defendants Have Engaged in Action.

The Freedom Foundation properly brought its pre-enforcement First Amendment challenge against the Union Defendants under §1983. "To state a claim under §1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Ochoa v. Pub. Consulting Grp., Inc.*, 48 F.4th 1102, 1107 (9th Cir. 2022). In the proceedings below, the Union Defendants urged the district court to avoid addressing the constitutional merits questions in this case because they purportedly did not engage in any "action" at all, let alone "state action." *See* ER-14-15. The court below embraced that first argument, finding it dispositive that the Union Defendants had not yet "filed or threatened to file a lawsuit under Chapter 307." ER-14.

The district court's §1983 conclusion is just as flawed as its justiciability determination. Nothing in §1983 requires a defendant to have engaged in, or to have expressly threatened to engage in, the allegedly unconstitutional action. *See, e.g.*, *Project Veritas*, 125 F.4th at 941-42 (allowing the plaintiff to bring a pre-enforcement First Amendment claim even though "Oregon has never threatened Project Veritas with enforcement proceedings"); *see* Verified Compl. ¶8, Prayer for Relief, *Project Veritas v. Schmidt*, No. 3:20-cv-1435 (D. Or. Aug. 24, 2020), Dkt.1 (bringing the pre-enforcement claim under 42 U.S.C. §1983). Instead, it is well-recognized that the "fail[ure] to affirmatively disavow an intent to enforce a challenged statute" qualifies as "action" too. *Lopez*, 630 F.3d at 788. As just explained, the Union Defendants have failed to do just that. That is sufficient to establish "action" for §1983 purposes.

Tellingly, the district court offered literally no authority to support its contrary view. Instead, the court again rested its decision on a policy concern—namely, that allowing pre-enforcement review here "would subject anyone to Section 1983 liability for simply existing in a state" that enacts a statute with a private cause of action. ER-14. That theory suffers from at least three fatal flaws. First, the ability to bring a cause of action against someone does not mean that the defendant will inevitably incur liability; it just means that the plaintiff gets his day in court. Second, §1983 liability cannot arise unless the private party deprives the plaintiff of its

constitutional rights while acting under color of state law. *Ochoa*, 48 F.4th at 1107. That obviously limits "Section 1983 liability" only to culpable conduct. *Contra* ER-14. Third, this is not a statute that gives all injured individuals a cause of action. Chapter 307 is a highly anomalous law that the Union Defendants procured to give them a distinct cause of action to target their adversary in an ongoing public-policy debate. There is no unfairness or slippery slope in allowing a suit against the Union Defendants in that distinct context.

#### 2. The Union Defendants Are Properly Characterized as State Actors.

The Union Defendants have not merely engaged in "action," however; they have engaged in *state* action under §1983. Although "merely private conduct" does not violate §1983, *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020), it is well-established that private actors are amenable to suit under §1983 when they engage in conduct that is "'fairly attributable' to the state," *id.*; *see Dennis v. Sparks*, 449 U.S. 24, 27 (1980). "[W]hether a nominally private person or corporation acts under color of state law 'is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020). Thus, "[n]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.*

This Court employs a "two-prong inquiry" to determine whether a private party qualifies as a state actor under §1983. *Belgau*, 975 F.3d at 946. In this litigation, the Union Defendants have never disputed the first prong, which seeks to determine whether the underlying "source of the alleged constitutional harm" is "a state statute or policy." *Id.* at 947. The answer here is indisputably yes, as the Freedom Foundation alleged that Chapter 307 (a state statute) is the source of the constitutional injury. ER-226-40.

The second prong seeks to determine whether the private party "could be described in all fairness as a state actor." *Belgau*, 975 F.3d at 947. "The Supreme Court has articulated four tests for determining whether a [private person's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 995 (9th Cir. 2013). The "public function" and "joint action" tests, however, "largely subsume the state compulsion and governmental nexus tests, because they address the degree to which the state is intertwined with the private actor or action." *Id.* at 995 n.13. For that reason, the Foundation "refer[s] only to the 'public function' and 'joint action' tests, but intend[s] thereby to incorporate all four tests." *Id.* The Union Defendants are state actors under both tests.

**a. Joint-Action Test**

Under the joint-action test, private conduct is attributable to the state "where

the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Rawson*, 975 F.3d at 748. As the Supreme Court explained in *Reitman v. Mulkey*, such encouragement exists when states enact "permissive state statute[s] as an authorization" for private actors "to discriminate" against others in violation of the Constitution. 387 U.S. 369, 379 (1967); *see Belgau*, 975 F.3d at 947. The state-action requirement is satisfied in those circumstances because, when a state enacts a law that is "intended to authorize, and does authorize," unconstitutional conduct, the state-conferred "right to" engage in that unconstitutional conduct transforms into "one of the basic policies of the state"—and thus it is fair to say that private entities that use the state-created mechanism to engage in that conduct have done so with the authority and encouragement of the state. *Reitman*, 387 U.S. at 380-81.

That perfectly describes the situation here. At the behest of the Freedom Foundation's political opponents—*viz.*, the Union Defendants—Oregon has enacted a law that authorizes and encourages those same political opponents to impose ruinous liability on the Foundation for engaging in protected First Amendment speech. Indeed, the state has gone so far as to decree that, if unions bring an enforcement action, they can earn a $6,250 bounty for each piece of mail or other communication that the Foundation sends in violation of the statute—meaning that

their payday could tally in the hundreds of millions of dollars. *Cf. United States v. Walther*, 652 F.2d 788, 791-93 (9th Cir. 1981). If *that* does not qualify as an effort to "affirm[], authorize[], encourage[], or facilitate[] unconstitutional conduct," *Belgau*, 975 F.3d at 947, it is difficult to imagine what does. Here, as in *Reitman*, Chapter 307 makes unlawful discrimination "one of the basic policies of the state" by creating the mechanism for that unlawful conduct and authorizing and encouraging private parties to engage in that conduct. 387 U.S. at 381.

**b. Public-Function Test**

The public-function test is satisfied too. Under that test, private entities "become agencies or instrumentalities of the State and subject to its constitutional limitations" when they "are endowed by the State with powers or functions governmental in nature." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003). "[T]he function at issue must be both traditionally and exclusively governmental" for the private party to qualify as a state actor. *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002). Here, the Union Defendants engage in at least two functions historically reserved as exclusively sovereign prerogatives—(1) the enforcement of state law for the public interest, and (2) the enforcement of speech restrictions in traditional public fora. Each provides an independent basis for concluding that the Union Defendants act under color of state law when they bring enforcement actions under Chapter 307.

1. Of course, "a state's ability to enforce its laws … is a basic state function." *Potrero Hills Landfill, Inc. v. County of Solano*, 657 F.3d 876, 883 (9th Cir. 2011). An essential attribute of state sovereignty is "the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). That law-enforcement power rests exclusively with the sovereign, and private parties cannot take it into their own hands. *See Buckley v. Valeo*, 424 U.S. 1, 138-40 (1976) (per curiam); *United States v. Nixon*, 418 U.S. 683, 693 (1974); Charles W. Rhodes & Howard M. Wasserman, *Judicial Process and Vigilante Federalism*, 108 Corn. L. Rev. Online 125, 140 (2023).

To be sure, states can—and routinely do—provide statutory causes of action to vindicate private rights. Such causes of action do not impermissibly invade the state's exclusive law-enforcement power because they redress private injuries. *See Huntington v. Attrill*, 146 U.S. 657, 668 (1892). But if those causes of action deputize private citizens to vindicate public rights, then the private citizen has seized the "traditional-and-exclusive government function." Rhodes & Wasserman, *supra*, at 140; *see Ellingburg v. United States*, 607 U.S. 163, 177-86 (2026) (Thomas, J., concurring) (distinguishing between private rights and public rights).

Chapter 307 delegates Oregon's sovereign law-enforcement functions to the Union Defendants. That is so for multiple reasons. First, Chapter 307 operates to

vindicate public interests, not to compensate unions for private harm. Chapter 307 creates no private rights or duties owed to unions; it makes certain conduct unlawful. That shows that a violation of Chapter 307 inflicts a public wrong—a harm to the "whole community"—rather than a private wrong that exclusively affects one particular person. 3 W. Blackstone, Commentaries on the Laws of England 2 (1768). Furthermore, it is significant that *any* union plaintiff can prevail in an enforcement action without ever showing *any* private injury *at all*. By the law's plain text, any "union representative" can bring an enforcement action—even if that representative is not affiliated with the allegedly impersonated union. And all that the union plaintiff must allege is a "violation," not actual harm. §1(4)(a). Thus, if the OEA catches wind that someone "falsely impersonated" the OSEA, it can launch an enforcement action and collect a bounty without ever showing any actual injury.

Second, the $6,250-per-incident bounty serves penal rather than remedial purposes. "Sanctions imposed for the purpose of deterring infractions of public laws are inherently punitive because 'deterrence [is] not [a] legitimate nonpunitive government objectiv[e].'" *Kokesh v. SEC*, 581 U.S. 455, 456 (2017). Here, there is no question that Chapter 307 exists to deter and punish wrongdoers rather than provide make-whole remedies for injured plaintiffs. Chapter 307's proponents lauded its bounty provision *because* it "provide[s] a meaningful deterrent to bad actors," Letter from Johnny Earl, President, SEIU Local 503, to the S. Comm. on

Lab. & Bus. 1 (May 6, 2025), https://perma.cc/MY4K-S5FP, and explained that they had arrived at a $6,250 bounty to "mirro[r] the fine for a [criminal] Class A misdemeanor," Letter from Tracy Ann Nelson, Exec. Dir., OEA, to Sen. Kathleen Taylor et al. 1, https://perma.cc/VSB7-VGSH. Because Chapter 307 exists to "spur" compliance with the law rather than compensate for actual injury, *Nordling v. Johnston*, 283 P.2d 994, 999 (Or. 1955), it is penal and thus protects public rather than private rights, *see Huntington*, 146 U.S. at 673-74.

That conclusion is reinforced by how the bounty provision works in practice. The $6,250 penalty attaches on a per-incident basis. Legislative sponsors argued, and the Union Defendants have not disputed, that an "incident" refers to each and every impersonating communication. *See* ER-239-40. Thus, the Freedom Foundation could face nearly $1 billion in liability for sending just a single piece of mail to each public-sector-union member in Oregon. That would amount to the death penalty for the Foundation—and it could suffer that penalty even if the unions suffer no actual injury from the alleged wrongdoing. That makes Chapter 307 the ultimate penal provision.

Finally, to the extent that this Court accepts the district court's conclusion that the State Defendants lack authority to enforce Chapter 307, *but see supra*, pp.21-27 (citing O.R.S. §180.060(1)(d)), then Chapter 307 vests private entities with the exclusive power to enforce state law. That would only confirm that the state

delegated its sovereign authority to enforce the law to the unions, thereby making them state actors to the extent that they bring enforcement actions under Chapter 307.

That conclusion accords with holdings from other courts that have evaluated comparable laws. Take, for example, Texas S.B. 8, which prohibited physicians from performing abortions in the absence of a medical emergency at a time when *Roe v. Wade* remained good law. *See Whole Woman's Health*, 595 U.S. at 35. S.B. 8 expressly directed enforcement to occur through "private civil actions" rather than through state officials, *id.* at 36, in an effort "to shield its unconstitutional law from judicial review," *id.* at 59 (Roberts, C.J., concurring in the judgment in part and dissenting in part). Various plaintiffs filed suit in state court against a private party that "did not disavow any intent" to enforce S.B. 8 via the private cause of action, arguing that the challenged law violated their constitutional rights. *Tex. Right to Life v. Van Stean*, 729 S.W.3d 896, 903-04, 909-11 (Tex. Ct. App. 2026). As here, the private defendants argued that the "court lacked jurisdiction to hear constitutional challenges against them because they are private individuals who are not state actors." *Id.* at 913. The court disagreed. "In this novel situation, where the Texas Legislature delegated enforcement of violations of the Act, punishable by substantial civil fines, to private citizens," the "private citizens who are threatening such enforcement are the appropriate parties to sue." *Id.* Because "the enforcement of

the statute has been delegated by the state to private citizens," the court continued, that private conduct "can be fairly attributed to the government" for purposes of the constitutional challenge. *Id.* The same is true here.

2. In addition, the Union Defendants qualify as state actors under the public-function test because Chapter 307 delegates to public-sector unions the "exclusively and traditionally public function" of "regulating free speech" in public fora. *Lee*, 276 F.3d at 554. This Court's decision in *Lee* is illustrative. That case involved an open-air plaza on public property operated and maintained by a private corporation. *See id.* at 552. The corporation set and enforced a speech code that applied to anyone that entered the plaza, and the city that owned the property "retained little, if any, power" to modify or enforce those policies. *Id.* at 552-53, 556. This Court held that the corporation qualified as a state actor under §1983 because it maintained responsibility for enforcing the speech regulations in the plaza (a public forum)—a power traditionally and exclusively wielded by the government. *See id.* at 553-57.

The Union Defendants are state actors under those principles too. Chapter 307 applies to proscribed "verbal or written communication[s]" wherever they are made, §1(1)(c)—including in traditional public forums like sidewalks and public parks, *see Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). It sets limits on what type of speech is actionable and, if the state is right that its officials do not enforce

Chapter 307, vests public-sector unions with the exclusive responsibility to enforce those speech regulations. That makes the Union Defendants like the private corporation in *Lee* because they alone have the power to ensure that regulated entities comply with the unconstitutional speech regulations created by Chapter 307.

*      *      *

As the foregoing demonstrates, the district court's decision refusing to proceed to the merits here is wrong several times over. It is also highly consequential. Supreme Court precedent has long envisioned that litigants like the Freedom Foundation will have the ability to bring pre-enforcement challenges to laws like Chapter 307. *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965); *see also Bland v. Fessler*, 88 F.3d 729, 736-37 (9th Cir. 1996). If the State Defendants are correct that the state cannot enforce the law, and if the unions that are vested with authority to enforce the law do not qualify as state actors under §1983, that would eliminate all pre-enforcement challenges to laws that chill speech and blatantly violate the First Amendment. Indeed, if the Defendants' arguments succeeded here, Oregon's legislature could target any groups that it dislikes with even more egregiously unconstitutional laws that will chill massive speech before those laws face any scrutiny.

Nor is there any reason to suspect that such constitutional damage will remain confined to the Beaver State. In fact, in the immediate aftermath of the district

court's decision, other states advanced copycat bills through their own legislatures. *See, e.g.*, AB 10835A, 2025-2026 Leg., Reg. Sess. §1 (N.Y. 2026). More laws are sure to follow. Simply put, the district court's decision is a roadmap to make a "solemn mockery" of the "constitution itself." *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809). This Court should stop that mischief in its tracks.[3]

## III. The Freedom Foundation Is Entitled To Preliminary Relief.

Because the district court dismissed the Freedom Foundation's complaint for threshold reasons, it denied the Foundation's motion for a preliminary injunction as "moot." ER-6. As explained above, there is no reason to dismiss the complaint. And as explained below, there is every reason to grant a preliminary injunction because the Foundation (1) is overwhelmingly likely to succeed on the merits of its claims, (2) will suffer irreparable harm in the absence of relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

---

[3] The district court cited *Whole Woman's Health* for the proposition that there is no categorical right to pre-enforcement review. *See* ER-15. That decision did not arise from the First Amendment context, where pre-enforcement review is necessary and customary. *See Virginia*, 484 U.S. at 393. Furthermore, the sole private party in *Whole Woman's Health* stipulated that he would not bring an action against the plaintiffs there. *See* 595 U.S. at 48. That is not the situation here.

## A. The Freedom Foundation Is Likely To Succeed On The Merits.

### 1. Chapter 307 Unconstitutionally Discriminates Between Unprotected Speech Based on Content and Viewpoint.

The first and most obvious problem with Chapter 307 is that it is content- and viewpoint-discriminatory in the extreme. The First Amendment prohibits persons acting under color of state law from restricting "expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* And the cardinal First Amendment sin is viewpoint discrimination, an even "'more blatant' and 'egregious form of content discrimination,'" which occurs when the government regulates speech "based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* at 168; *see, e.g.*, *Chiles v. Salazar*, 146 S.Ct. 1010, 1020-26 (2026).

Chapter 307 unlawfully regulates based on content because it "singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc). The law prohibits communications that falsely "purport[] to be authorized … by a labor organization," §1(1)(c), (2), which is defined as "any organization that has as one of its purposes representing employees in their employment relations with public employers," O.R.S. §243.650(13); *see*

§1(1)(b) (adopting O.R.S. §243.650(13)'s definition of "labor organization"). Unlike most laws aimed at misrepresentations, Chapter 307 is facially limited to particular content on its face, even going so far as to distinguish between public-sector and private-sector unions. The law plainly discriminates based on content "on its face" because it "draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163; *see Valle del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013).

More perniciously, Chapter 307 facially discriminates based on viewpoint. "The text of the statute alone shows it is meant to protect" unions from anti-union speech. *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021). Impersonating communications are off-limits only when offered with "the intent to undermine or interfere with the operations of the labor organization, or otherwise negatively impact the labor organization." §1(1)(c). Thus, if someone impersonated a union representative for the purpose of helping the labor organization—*e.g.*, to dupe public-sector workers into opting into the union, *cf.* Attachment Submitted by Ben Straka (Dec. 10, 2014), https://perma.cc/T8DY-H9LH (last visited on July 2, 2026), or to employ misrepresentations to encourage union members to ignore truthful Freedom Foundation communications—that person would not violate the statute. That sort of disparate treatment unmistakably qualifies as viewpoint discrimination. *See, e.g.*, *Kelly*, 9 F.4th at 1233; *Chaker v. Crogan*, 428 F.3d 1215,

1224-29 (9th Cir. 2005). Chapter 307 then reinforces that viewpoint discrimination by empowering union representatives, with their obvious pro-union viewpoint, to enforce the statute.

It is no answer that Chapter 307 ostensibly regulates unprotected "misleading" speech because the Supreme Court's decision in *R.A.V. v. City of St. Paul* "holds that even entirely unprotected content cannot be targeted on the basis of view-point." *United States v. Alvarez*, 617 F.3d 1198, 1204 n.4 (9th Cir. 2010). The law in *R.A.V.* provided:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

505 U.S. 377, 380 (1992). The Minnesota Supreme Court limited that ordinance to unprotected speech, *i.e.*, "only those expressions that constitute 'fighting words.'" *Id.* at 381. Even accepting that construction, the Supreme Court invalidated the statute because governments cannot discriminate based on viewpoint even within categories of speech that they can prohibit altogether. *See id.* at 381-90. The St. Paul ordinance had that fatal defect because it limited the law's scope to "'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender.'" *Id.* at 391. But the law did "not cover[]" displays that, for example, "express[ed] hostility … on the basis of political affiliation, union membership, or

homosexuality." *Id.* "The First Amendment [did] not permit St. Paul to impose [such] special prohibitions on those speakers who express views on disfavored subjects." *Id.* As Justice Scalia famously wrote for the Court, the government cannot "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *Id.* at 392.

That is precisely what Chapter 307 does—it burdens one side of an ongoing debate with potentially crippling penalties, while leaving the other side constrained only by neutral rules that apply to both sides. Indeed, the viewpoint discrimination here is even more striking than in *R.A.V.* since Chapter 307 not only picks sides by burdening one side in an ongoing debate, but it then empowers their debating adversaries to enforce the statute and chill their adversaries' speech. It is hard to imagine a more obvious or more obviously unconstitutional instance of viewpoint discrimination.

Worse still, the debate the government has interfered with is a debate that the First Amendment requires to be unfettered. The whole point of *Janus* was to allow public-union members to make decisions about union membership free from government coercion. The Supreme Court's decision in *Janus* thus kicked off a spirited debate between pro-union and anti-union forces over whether members of public-sector unions should exercise their First Amendment right to opt out. To be sure, neither side of that ongoing debate has a constitutional right to use fighting

words or affirmative falsehoods or true threats to further their side of the debate, but both sides have a constitutional right to neutral regulation of unprotected speech that does not skew the debate in one direction or the other. In the context of fraudulent speech, longstanding content- and viewpoint-neutral anti-fraud laws applicable to both sides of the debate are the constitutional solution to ensuring that the robust debate does not cross over into unprotected speech. Layering on top of that neutral restriction a prohibition that operates on only one side of the debate is a clear example of the government impermissibly putting its thumb on the scale of the pro-union speakers. And the viewpoint discrimination is even more offensive, as the government has taken the step of giving enforcement power to those on one side of the debate.

The sizable and "disproportionate sanctions" that individuals or entities face for violating Chapter 307 further "evidences the [state's] desire to suppress … speech." *Valle del Sol Inc.*, 709 F.3d at 819, 820. Most Oregon laws creating private causes of action affording statutory damages provide far more modest penalties. *See, e.g.*, O.R.S. §133.875(1)(c)(B), (2)(c)(B) ($500 and $1,000 in statutory damages for unlawfully retaining or displaying booking photos); *id.* §30.845(2)(a)(B) ($250 for using the police against another person with intent to harm); *id.* §646.638(1) ($200 for unlawful trade practices); *id.* §30.851(2)(b) ($500 or $5,000 for interfering with healthcare personnel or facilities). Even far more culpable conduct—like

intentionally sharing someone's intimate images—receives less serious penalties than the damages imposed here. *See id.* §30.833. The disproportionate penalties that Chapter 307 imposes underscore its impermissible purpose.

Although Chapter 307 discriminates on its face, the legislative record reinforces its impermissible discrimination on the basis of content and viewpoint. *See United States v. Griefen*, 200 F.3d 1256, 1265 (9th Cir. 2000) (explaining that courts can examine the legislative record to see whether "the true purpose of [the law] was to silence disfavored speech or speakers"); *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018). To start, the legislative record leaves no doubt that the public-sector unions were the prime movers behind this one-sided legislation empowering them to squelch their adversaries' speech. During committee hearings, legislators identified the "legal team behind the bill" as a law firm that represents labor unions. ER-221. And union officials testifying in favor of the bill candidly acknowledged the "iterative" process that they (not elected officials) went through "with many kinds of lawyers" to craft Chapter 307's provisions. ER-228. It is no great surprise then that Chapter 307 skews the playing field in favor of the public-sector unions at every turn.

The legislative record is replete with evidence that the unions drafted Chapter 307 to "silence disfavored speech" and to prop up labor organizations. *Griefen*, 200 F.3d at 1265. Proponents repeatedly and consistently decried communications

distributed by "anti-union" and "union busting" organizations, and they attributed those communications to groups "funded by conservative think tanks" and people that want to "get rid of public education altogether." ER-229. They lauded Chapter 307 as "critical [to] keeping [union] membership safe from … anti-union groups" and urged lawmakers to enact the bill "to protect [union] members" by "afford[ing] the union an opportunity to speak to the members and let them know what dropping their membership will mean to them." ER-229 (emphasis omitted). Legislative proponents focused on the alleged benefits that unions provide—and the harmful consequences that follow from weakening the union by encouraging opt-outs—instead of providing credible evidence about actual impersonation. *See, e.g.*, ER-229-30.

Indeed, the record contains considerable evidence that Chapter 307 targets the Freedom Foundation specifically. One legislative proponent gave an "exampl[e]" on the House floor of the conduct that the bill sought to combat: a website created by the Foundation to facilitate OSEA members to opt out of their union. ER-230. The lawmaker expressly described the website as "a project of the Freedom Foundation," and explained why she deemed it deceptive. ER-230. One of the attorneys behind the bill testified about "deceptive fliers" that "appear to be" from the union itself and include, for example, fake checks "from the Freedom Foundation." ER-230. And the only evidence of so-called impersonating

communications that proponents could muster came in the form of mailers from the Foundation, *see, e.g.*, ER-222, sometimes deceptively edited to remove information identifying the Foundation as the speaker, *see* ER-230. After one union official recounted various mailers from the Foundation, he insisted that the legislature should "tell them to stop." ER-222. The legislature obliged and enacted Chapter 307 with the avowed purpose of shutting down one side in an ongoing and constitutionally vital debate.

Because Chapter 307 discriminates based on content and viewpoint, it triggers—and flunks—strict scrutiny, *see First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017). Strict scrutiny requires proof that the law furthers a compelling governmental interest and is narrowly tailored to that end. *See X Corp. v. Bonta*, 116 F.4th 888, 903 (9th Cir. 2024). Defendants have never even suggested that Chapter 307 satisfies that demanding standard.

#### 2. Chapter 307 Unconstitutionally Infringes Protected Speech.

Chapter 307's content- and viewpoint-based discrimination is sufficient to invalidate the law and make clear that Freedom Foundation is overwhelmingly likely to succeed on the merits of this dispute. But that is far from Chapter 307's only flaw. While the statute purports to target unprotected misrepresentations, in reality, both "text and context" confirm that it regulates protected speech on matters of public importance. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017).

The Foundation educates public-sector union members about their constitutional right not to pay union dues and assists those members to exercise that right. *See supra*, pp.4-6. It does so by using time-honored tools of political advocacy—including informational mailers, online materials, and volunteer assistance—to help employees understand and exercise their rights. *See id*. That speech unquestionably concerns matters of substantial public importance and thus lies at the heart of the First Amendment's protections. *See Thomas v. Collins*, 323 U.S. 516, 532 (1945).

The Freedom Foundation's speech is not just protected; it is effective. The Foundation caused numerous former union members to exercise their *Janus* rights to opt out of union membership, with a corresponding negative effect on the union coffers. The unions reacted with Chapter 307. The law targets for regulation the mailers and pamphlets that the Foundation has distributed for years in an effort to promote awareness among union members of their constitutional rights. The legislative record is teeming with evidence that Chapter 307 exists to punish the Foundation's speech—indeed, both the law's legislative sponsors and its proponents expressly identified Foundation materials as proof of the "impersonation" that the law sought to prohibit. *See supra*, pp.13-14, 54-56.

But those materials plainly reflect protected speech, not unprotected misrepresentations or impersonation. For example, the "Check" mailer—identified by legislative proponents as an example of the "deceptive fliers" that the Freedom

Foundation sends, *see* ER-222—identifies "Freedom Foundation" on the envelope as the sender, and informs union members of their opt-out rights under *Janus*, ER-136. That is plainly protected speech and just as plainly not deceptive. And going forward, Chapter 307 is virtually guaranteed to sweep in vast swaths of protected expression. To recover the $6,250 bounty, Chapter 307 does not require union plaintiffs to show any actual harm from the allegedly impersonating speech. The law bans speech that spreads misinformation or omits material facts when delivered with the intent to "negatively impact the labor organization." §1(1)(c). That leaves open the possibility that (for example) a mailer sent to union members that uses the same color scheme and font as the union—and distributed with the intent to convince members to exercise their right to opt-out—would trigger liability. After all, the union could argue that (1) the similar color scheme conveys the impression that the union "authorized or … approved" the mailer, (2) the speaker's use of that color scheme or failure to prominently disclaim affiliation with the union either spread "misinformation" or failed "to make known [a] material fact," and (3) the desire to encourage opt-outs "negatively impact[s] the labor organization" by reducing its membership and losing union dues. §§1(1)(c), (1)(d); *see* O.R.S. §677.188. That example—taken straight from the legislative record as an example of what the law sought to prohibit—proves beyond doubt that Chapter 307 imposes liability on protected speech.

Because Chapter 307 burdens the Freedom Foundation's protected speech, it is subject to strict scrutiny. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010). The law fails that test in this context too. *See supra*, p.56.

**3. Chapter 307 Unconstitutionally Compels Speech.**

Chapter 307 also violates the First Amendment's prohibition against compelled speech. "A direct disclosure requirement that 'compel[s] individuals to speak a particular message' or 'alter[s] the content' of protected speech is generally viewed as a content-based 'compelled speech' requirement subject to strict scrutiny." *PhRMA v. Stolfi*, 153 F.4th 795, 810 (9th Cir. 2025). Chapter 307 effectively compels speech by conditioning the Freedom Foundation's ability to deliver its communications on the use of prominent disclosures stating the source of the message. If the state compelled organizations to alter their speech by including prominent disclosures about the identity of the speaker along the content-and-viewpoint-based lines that Chapter 307 draws, that would trigger (and fail) strict scrutiny. *See id.*; *see, e.g.*, *Wash. Post v. McManus*, 944 F.3d 506, 514, 523-24 (4th Cir. 2019). The state cannot circumvent the compelled-speech doctrine by forcing entities to include disclosures to avoid liability, as the government "cannot do indirectly what [it] is barred from doing directly." *NRA v. Vullo*, 602 U.S. 175, 190 (2024). And here, Chapter 307's coercive consequences are already on full display. The Foundation has had no choice but to add prominent disclaimers to its

constitutionally protected speech that it would not otherwise include but for Chapter 307's provisions. *See supra*, pp.14-16.

#### 4. Chapter 307 Is Unconstitutionally Vague.

Last but not least, Chapter 307 is unconstitutionally vague. "A statute is void for vagueness if it 'fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013). Importantly, the Due Process Clause "demands a greater degree of specificity" from the law when—as here—it "is capable of reaching expression sheltered by the First Amendment." *Lane v. Salazar*, 911 F.3d 942, 950 (9th Cir. 2018). Chapter 307 is a classic example of an impermissibly vague law.

The first vagueness problem with Chapter 307 is that it does not adequately define the *actus reus*. Oregon's law prohibits speakers from "falsely impersonat[ing] a union representative," §1(2), which occurs when the speaker uses "fraud or misrepresentation to make a verbal or written communication that purports to be authorized or otherwise approved by a labor organization but that has not, in fact, been authorized or approved by the labor organization," §1(1)(c). The law defines "fraud or misrepresentation" to include "the intentional misrepresentation or misstatement of a material fact, concealment of or failure to make known any material fact, *or any other means by which misinformation or a false impression knowingly is given*." O.R.S. §677.188(1) (emphasis added).

The residual clause in Chapter 307—which prohibits speakers from using "any other means" to knowingly convey "misinformation or a false impression"—fails to inform persons of ordinary intelligence about what conduct the law covers. Chapter 307 does not define "misinformation" or "false impression." Nor does it provide "explicit standards" for distinguishing misinformation and false impressions from the ordinary components of political mailers—taglines, partial quotations, attention-grabbing headlines, design choices, and contextual framing. *Edge v. City of Everett*, 929 F.3d 657, 665 (9th Cir. 2019). The Freedom Foundation thus cannot know *ex ante* whether union members will find its speech misleading.

Making matters worse, Chapter 307 fails to give regulated parties like the Freedom Foundation adequate notice because it defines the guilty act by reference to the audience's "wholly subjective judgment[s]." *Tingley*, 47 F.4th at 1089. This Court has already held that statutes that prohibit speakers from "convey[ing] the impression" that the speaker is engaged in certain conduct is "highly subjective" and thus unconstitutionally vague. *Free Speech Coal. v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999). Similar to the statute in *Free Speech Coalition*, liability under Chapter 307 attaches simply when the audience perceives that the "communication … purports to be authorized or approved by a labor organization." §1(1)(c); *see also Thomas v. Collins*, 323 U.S. 516, 535 (1945).

Chapter 307's *mens rea* requirement is also impermissibly vague. The law prohibits individuals from giving false impressions about union affiliation when done with the "intent to … *negatively impact the labor organization*." §1(1)(c) (emphasis added). Beyond making the viewpoint-discriminatory nature of the law undeniable, *see supra*, pp.13-14, 49-56, the exact boundaries of what "negatively impact the labor organization" means are far from clear. Suppose the Freedom Foundation delivers mailers stating truthful information about a union member's opt-out rights with the intent to convince that member to exercise those rights to opt out. Does the Foundation act with the guilty mental state, even though its subjective purpose is merely to encourage public-sector employees to exercise their First Amendment right to opt out of union membership? *See Janus*, 585 U.S. at 930. The notion that a person has a culpable *mens rea* merely when encouraging the exercise of constitutional rights is bizarre. But it is hard to deny that opt-outs harm the union financially, even though that financial harm is the direct and inevitable effect of individuals exercising their constitutional rights.

### B. The Remaining Factors Favor Granting Relief.

The remaining preliminary-injunction factors are readily satisfied too. The Freedom Foundation is suffering irreparable harm from the loss of its First Amendment rights. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam). And the public-interest and the balance-of-equities factors

also favor preliminary relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). A preliminary injunction is amply warranted.

## CONCLUSION

For the foregoing reasons, the Court should reverse with instructions to enter a preliminary injunction in the Freedom Foundation's favor.

Respectfully submitted,

REBEKAH SCHULTHEISS
FREEDOM FOUNDATION
P.O. Box 552
Olympia, WA 98507

PAUL D. CLEMENT
*Counsel of Record*
ANDREW LAWRENCE
PHILIP HAMMERSLEY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellant*

July 2, 2026

## STATEMENT OF RELATED CASES

Pursuant to Federal Rules of Appellate Procedure 28-2.6, Appellant states that there are no related cases to this appeal.

July 2, 2026

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 13,921 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

July 2, 2026

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on July 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

# ADDENDUM

# TABLE OF CONTENTS

Or. H.B. 3789 (2025) .................................................................................... 1

83rd OREGON LEGISLATIVE ASSEMBLY--2025 Regular Session

# Enrolled
# House Bill 3789

Sponsored by Representatives PHAM H, SOSA, NERON, ANDERSEN, GRAYBER; Representatives CHAICHI, CHOTZEN, DOBSON, FRAGALA, GAMBA, GOMBERG, HUDSON, KROPF, MUNOZ, NELSON, NOSSE, WALTERS, WATANABE, Senators BROADMAN, FREDERICK, LIEBER, MANNING JR, PATTERSON, PHAM K, PROZANSKI, REYNOLDS

CHAPTER .................................................

AN ACT

Relating to union misrepresentation.

**Be It Enacted by the People of the State of Oregon:**

**SECTION 1.** **(1) As used in this section:**

**(a) "Designated representative" has the meaning given that term in ORS 243.796.**

**(b) "Exclusive representative" and "labor organization" have the meanings given those terms in ORS 243.650.**

**(c) "Falsely impersonate a union representative" means to use fraud or misrepresentation to make a verbal or written communication that purports to be authorized or otherwise approved by a labor organization but that has not, in fact, been authorized or approved by the labor organization, with the intent to undermine or interfere with the operations of the labor organization, or otherwise negatively impact the labor organization.**

**(d) "Fraud or misrepresentation" has the meaning given that term in ORS 677.188.**

**(e) "Union representative" means:**

**(A) An exclusive representative.**

**(B) A designated representative.**

**(C) An employee or staff member of a labor organization.**

**(D) A member of a labor organization who serves in an elected or appointed position within the union.**

**(2) It is unlawful for any person to falsely impersonate a union representative.**

**(3) To protect public employees who are members of a labor organization from fraud or misrepresentation, including the false impersonation of a union representative, a labor organization shall have, as a matter of internal governance, the sole authority to identify and designate the union representatives associated with the labor organization.**

**(4)(a) A union representative alleging a violation of this section may bring a civil action in a court of appropriate jurisdiction to obtain damages.**

**(b) In addition to and not in lieu of any other damages that may be claimed, a plaintiff shall receive statutory damages in an amount of $6,250 per incident in any action in which the plaintiff establishes that the defendant falsely impersonated a union representative.**

---

**Passed by House April 10, 2025**

**Repassed by House June 2, 2025**

..................................................................................
Timothy G. Sekerak, Chief Clerk of House

..................................................................................
Julie Fahey, Speaker of House

**Passed by Senate May 28, 2025**

..................................................................................
Rob Wagner, President of Senate

**Received by Governor:**

........................M.,........................................................., 2025

**Approved:**

........................M.,........................................................., 2025

..................................................................................
Tina Kotek, Governor

**Filed in Office of Secretary of State:**

........................M.,........................................................., 2025

..................................................................................
Tobias Read, Secretary of State